1   STEPHEN A. SCOTT (SBN 67467)
    CHARLES E. TILLAGE (SBN 177983)
2   **HAYES SCOTT BONINO**
    **ELLINGSON & GUSLANI LLP**
3   333 Twin Dolphin Drive, Suite 230
    Redwood City, CA  94065
4   Telephone: 650.637.9100
    Facsimile:  650.637.8071
5
6   Attorneys for Plaintiff
    FABRINET
7

8               UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  FABRINET, a Cayman Islands Company,          CASE NO.:

12              Plaintiff,
                                                 **COMPLAINT FOR BREACH OF**
13      v.                                       **CONTRACT; ACCOUNT STATED**

14  PIVOTAL SYSTEMS CORPORATION, a                **DEMAND FOR JURY TRIAL**
    Delaware Corporation; and DOES 1-10,
15  inclusive,

16              Defendants.

17

18      Plaintiff FABRINET ("Fabrinet" or "Plaintiff") complains of Defendant as follows:

19
        1.      Fabrinet brings this action for Breach of Contract and Account Stated for
20
    recovery of money owed to Fabrinet by Defendant Pivotal Systems Corporation ("Pivotal"
21
    or "Defendant") pursuant to the mutually agreed upon Volume Supply Agreement ("VSA"
22
    attached hereto as Exhibit A).
23

24                      **JURISDICTION AND VENUE**
25
        2.      This Court has jurisdiction over all parties of this lawsuit under 28 U.S.C. §
26
    1332(a)(1) because the parties are citizens of different states, and the amount in controversy
27
    exceeds $75,000, exclusive of attorneys' fees, interest, and costs.
28

3.      Plaintiff Fabrinet is a corporation organized under the laws of the Cayman Islands and has its principal place of business in Thailand.  As such, for diversity purposes, Fabrinet is a citizen of the Cayman Islands.

4.      Defendant Pivotal is a corporation organized under the laws of Delaware and has its principal place of business in California.  As such, for diversity purposes, Pivotal is a citizen of the state of California and is subject to the jurisdiction of this Court.

5.      As Fabrinet, on the one hand, and Pivotal, on the other hand, are situated in and citizens of different states and countries, a diversity of citizenship exists.  Additionally, as set forth more fully below, this case involves an adjudication of the rights and obligations under the parties VSA for debts and claims in excess of $75,000.  Therefore, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

6.      Fabrinet and Pivotal have consented through the VSA to in personam jurisdiction and venue in this Court.  (VSA, p. 13, ¶ 29.)

## FACTUAL BACKGROUND

### A.  The Parties

7.      Fabrinet provides product manufacturing and engineering services specializing in the production of electro-optical components, industrial lasers, and sensors.

8.      Pivotal designs and creates products used for gas-flow monitoring and has created patented products to provide this service.

### B.  The VSA and The Contractual Relationship Between Fabrinet and Pivotal

9.      The VSA provided that Fabrinet would manufacture components, modules, and subassemblies that were requested by Pivotal.  Pivotal, in turn, would provide monetary compensation for Fabrinet's manufacturing of Pivotal's products.

10.      Fabrinet would manufacture Pivotal's products by obtaining the necessary electrical components and other materials ("raw materials") as specified and with Pivotal's approval, and then proceed to assemble, test, package, and ship the assembled Pivotal product according to Pivotal's design and specification.  The raw materials that were to be used in Pivotal's products could be purchased and supplied by either Fabrinet or Pivotal.

11.     Fabrinet and Pivotal agreed that the VSA would be for an "initial period of three (3) years commencing on the Effective Date" and then "renew automatically for successive one (1) year periods unless either party provides written notice of its intent to terminate the Agreement no later than one hundred eighty (180) days prior to the expiration of the Initial Term or any Renewal Term." The Effective Date of the VSA was March 1, 2019.

12.     Fabrinet agreed through the VSA that:

"1.     Obligations of Fabrinet.
1.1     Fabrinet will arrange sufficient capacity, as agreed between the parties, to enable it to maintain manufacturing operations to support Customer's current and forecasted demand for Product.
1.2     Fabrinet will use Production Forecasts, Orders and Build Plans (each defined below) provided by Customer as a basis to plan and buy direct and indirect raw materials and production supplies as necessary to meet Customer's demand.
1.3     Fabrinet will assemble Product in compliance with Specifications (defined below) provided by Customer.
1.4     Fabrinet's obligation to perform under this Agreement is expressly conditioned upon Customer not being in material default of its obligations hereunder."

13.     Pivotal agreed through the VSA to:

"2.     Obligations of Customer.
2.1     Customer will provide all designs, drawings, technical information and specifications (collectively, the "Specifications") required for Fabrinet to procure materials, build, test, export Product, and conduct other activities associated with the production and delivery of Product.
…
2.3     Customer understands and agrees that the first thirteen (13) weeks of each Production Forecast will represent a binding commitment by Customer to purchase such quantities of Product from Fabrinet, for which Customer will issue a thirteen (13) week firm purchase order ("Order") with each Production Forecast. The terms and conditions of this Agreement will be incorporated into each Order. In the event of any conflicts, differences or inconsistencies between the terms and conditions of this Agreement and those of any Order, quotation, acknowledgement or any other related document (included pre-printed forms), the terms of this Agreement will govern.

…"

14.   Both parties agreed through the VSA that:

"4.   <u>Product Demand and Inventory Liability</u>.
4.1    Fabrinet will use product demand information from Customer's Production Forecasts, Orders and Build Plans to plan and buy raw materials, including materials with long lead times ("LongLead Time Components"), materials that are non-cancelable/non-returnable to a supplier ("NCNR"), materials that require minimum order quantities ("MOQ"), materials that are unique to Customer's requirements ("Custom Components") and materials that are agreed upon in writing by the parties to require special treatment ("Special Components"). Customer and Fabrinet will agree upon a list of LongLead Time Components, NCNR, MOQ, Custom Components and Special Components, including procurement terms, to be attached to this Agreement as Exhibit A. Exhibit A required for each approved board and reviewed quarterly as part of QBRs
4.2    Customer understands and agrees that Fabrinet has no liability for raw material (including but not limited to on-hand and on-order Long-Lead Time Components, NCNR, MOQ, Custom Components and Special Components), work in process, or finished goods (collectively "Inventory"), provided that Fabrinet complies with the terms of this Agreement. Customer is liable for all amounts due with respect to any Inventory that remains at the expiration or termination of this Agreement, or in the event of any Order cancellation or Product cancellation or end-of-life.
…
4.8    <u>Revaluation</u>. Customer and Fabrinet may agree, from time to time, to revise the standard cost of raw materials required to manufacture Product to reflect current materials pricing.  Prior to the implementation of any price or cost reductions, Customer will issue a revaluation purchase order to Fabrinet for the aggregate price difference between the old standard cost and the new standard cost for each unit of raw material validly procured by Fabrinet under the terms of this Agreement. If Customer chooses not to issue a revaluation purchase order, then it must fully consume the existing inventory of raw materials at the old standard price prior to the implementation of any price or cost reductions. Pricing is to be reviewed at QBRs with emphasis to lower cost and reduce risk of material exposure."

15.   The VSA also contained a provision addressing the raw materials that had been obtained for a finished product but that was not capable of presently being

utilized.

"5.   Excess Inventory and Obsolete Inventory.

5.1   Excess Inventory.  Excess Inventory is defined as raw materials purchased by Fabrinet in compliance with the terms of this Agreement that have not been consumed within thirteen (13) weeks of Fabrinet's receipt of such raw materials (the "Excess Inventory Period"). … Fabrinet will provide an excess inventory report to Customer during the second week of every month. On a quarterly basis, Fabrinet will invoice Customer for all raw materials deemed Excess Inventory at the standard cost including incoming freight charges and material handling fees (burden) unless otherwise agreed in writing.

5.2   Obsolete Inventory.  Obsolete Inventory is defined as (i) raw materials that, as a result of an ECO (defined at section 6, below), Product cancellation or end-of-life, have not been or will no longer be utilized in the manufacture of Product; and (ii) raw materials that have aged beyond the shelflife period agreed by the parties. Fabrinet will provide an obsolete inventory report to Customer every month. Fabrinet will promptly invoice Customer for any raw materials deemed Obsolete Inventory at the standard cost including incoming freight charges and material handling fees (burden). …

…

5.4   Customer's failure to timely pay for Excess Inventory or Obsolete Inventory pursuant to the terms of this Agreement, upon presentation of a valid undisputed invoice, is a material breach of this Agreement."

16.   The VSA also contains a Force Majeure clause as follows:

"19.   Force Majeure.  Neither party will be liable for any delay in performing, or for failing to perform, its obligations under this Agreement (other than the payment of money) resulting from any cause beyond its reasonable control including, acts of God; … epidemics; strikes; work stoppages; slow-downs; industrial disputes; … provided that the party affected by such event promptly notifies (in no event more than five (5) business days from discovery of the event) the other party of the event. If the delays caused by the force majeure conditions are not cured within thirty (30) days of the force majeure event, then either party may immediately terminate this Agreement. Termination of this Agreement pursuant to this section 19 will not affect Customer's obligation to pay Fabrinet for services provided, as set forth herein."

**C. Pivotal Refuses to Provide a Purchase Order for Excess Inventory and Breaches**

**The VSA**

17.    Fabrinet and Pivotal began working together pursuant to the March 1, 2019, VSA, which was automatically renewed on March 1, 2022 for the following year since neither party provided written notice to terminate the VSA.

18.    Pivotal provided Fabrinet with Production Forecasts that projected the types of products that Pivotal expected to purchase pursuant to the VSA.  Fabrinet then acquired the raw materials to manufacture Pivotal's finished products.  Pivotal, at times, would acquire raw materials that were needed for Pivotal's finished products and Fabrinet would purchase said raw materials from Pivotal.

19.    The lead times for the purchase of raw materials would vary depending on the specific raw material needed.  Before the onset of the COVID-pandemic, lead times for raw materials often ranged from 1 - 4 weeks.

20.    The COVID-pandemic began in 2020.  As a result of the pandemic, raw material shortages commonly occurred.  Fabrinet experienced increased lead times for raw materials due to these shortages, up to approximately 52 weeks.

21    To combat the increased lead times for raw materials during, and following, the COVID-pandemic, and after first receiving Pivotal's approval, Fabrinet purchased raw materials needed for Pivotal's products whenever the raw material became available and even when other raw materials, that were also needed for that same product, were unavailable.

22.    Fabrinet would often find required raw materials at a price above the originally approved price due to shortages affecting these materials and would obtain the raw materials at the increased price once Pivotal approved the purchase.

23.    Fabrinet's practice resulted in an increased Excess Inventory, as defined in the VSA, due to these stock availability issues.  The Excess Inventory increased because the purchased raw materials were, at times, unable to be assembled into a finished product due to the unavailability of other needed raw materials.  Fabrinet and Pivotal continued

searching for the other needed materials to manufacture the Pivotal products and use the raw materials that were in the Excess Inventory.

24.     Pivotal was aware of Fabrinet's aforementioned practice and agreed to it.

25.     The VSA requires that Fabrinet invoice Pivotal for "all raw materials deemed Excess Inventory."  (VSA, pg. 4, ¶ 5.1.)  Pivotal's "failure to timely pay for Excess or Obsolete Inventory" is a material breach of the VSA.  (VSA, pg. 4, ¶ 5.4.)

26.     As agreed in the VSA, Fabrinet would send an invoice to Pivotal for the Excess and Obsolete Inventory and Pivotal would then provide a corresponding Purchase Order.  Pivotal provided Purchase Orders for the Excess and Obsolete Inventory on every occasion that Fabrinet had requested one from March 1, 2019 to November 30, 2022.

27.     On, or about, Thursday, December 15, 2022, Fabrinet sent Excess Inventory invoices to Pivotal.  Fabrinet requested that Pivotal provide a Purchase Order for the December 15, 2022 invoices totaling $529,973.79 by December 16, 2022.

28.     On, or about December 17, 2022, Pivotal acknowledged the December 15, 2022 invoices but declined to provide a Purchase Order, stating it would process the December 15, 2022 invoices in January 2023.  Pivotal did not object or dispute the December 15, 2022 invoices.

29.     On, or about, December 18, 2022, Fabrinet informed Pivotal that processing the December 15, 2022 invoices in January 2023 was unacceptable and invoiced Pivotal for the remaining total of $546,128.79 that Pivotal owed to Fabrinet in the Fourth Quarter of 2022.

30.     On, or about, December 18, 2022, Fabrinet placed Pivotal's account on hold due to non-payment of the December 15, 2022 invoices.  Fabrinet did not ship any further products to Pivotal and advised Pivotal that the hold would remain until payment of the December 15, 2022 invoices was processed.

31.     On December 30, 2022, Pivotal sent emailed Fabrinet, with an attached invoice, demanding that Fabrinet pay Pivotal $891,000 for raw materials that Pivotal earlier had paid to Fabrinet to ensure the availability of raw materials, but for which it asserted it

had not received the benefit.

32.     As of the filing of this Complaint, Pivotal has not issued a Purchase Order to Fabrinet for the December 15, 2022 invoices.

34.     On January 17, 2023, Fabrinet disputed Pivotal's $891,000 invoice and has attempted contact with Pivotal in an effort to resolve the dispute to no avail.

35.     As of March 31, 2023, Fabrinet has: $1,939,246.43 of "on-hand" raw materials for Pivotal orders, $538,310.44 of "on-order" raw materials for Pivotal orders, and an Accounts Receivable balance due of $976,940.27.   Accordingly, Pivotal's current financial obligation to Fabrinet is $3,454,497.14.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

36.     Fabrinet incorporates paragraphs 1 through 35 as though fully set forth herein.

37.     Fabrinet and Pivotal, for valuable consideration, entered into a valid and enforceable contract on March 1, 2019 for the performance of services by Fabrinet in return for money payments by Pivotal.

38.     All conditions precedent to the obligations of Fabrinet under its contract with Pivotal have been satisfied, waived, and/or excused.   The obligation of Pivotal to provide payment to Fabrinet for Pivotal's Excess and Obsolete Inventory, and for on-hand, on-order materials that Fabrinet has, is currently due and owing.

39.     Pivotal's refusal to timely provide a Purchase Order for the Excess and Obsolete Inventory that was subject to the December 15, 2022 invoice is a material breach of the VSA.

40.     Pursuant to the VSA, Pivotal is "liable for all amounts due with respect to any Inventory that remains at the expiration or termination" of the VSA.  (VSA, pg. 3, ¶ 4.2.)

41.     Fabrinet is entitled to damages due to Pivotal's breach of contract under the

VSA for the costs incurred in connection with the materials that Fabrinet has acquired for Pivotal's finished products, and for Fabrinet's Accounts Receivable statements, that total being $3,454,497.14, plus an award of attorney's fees under the VSA.

## SECOND CAUSE OF ACTION
### (Account Stated)

42. Fabrinet incorporates paragraphs 1 through 35 as though fully set forth herein.

43. From March 1, 2019 through November 30, 2022, Fabrinet would send invoices to Pivotal for Excess and Obsolete Inventory. Pivotal would then provide Fabrinet with a Purchase Order for the Excess and Obsolete Inventory.

44. On, or about, December 15, 2022, Fabrinet sent to Pivotal a summary of all of the transactions between the parties showing all amounts owed by Pivotal to Fabrinet, indicating a balance of $529,973.79 owing by Pivotal to Fabrinet on that date.

45. Pivotal did not object to the invoices summarized in the December 15, 2022 email and agreed to provide payment in January 2023.

46. Pivotal has had a reasonable time to object to the account as rendered but has not done so and has thus impliedly agreed that the account was correct as rendered.

47. An account was therefore stated between the parties on December 15, 2022 and Pivotal agreed to pay Fabrinet, but Pivotal has not paid the $529,973.79 owed to Fabrinet on December 15, 2022.

## PRAYER

WHEREFORE, Fabrinet prays for judgment against Defendant Pivotal, as follows:

1. For compensatory damages for breach of contract, including prejudgment interest from the time first allowed by law and according to proof;

2.    For an award of attorney's fees;

3.    For recovery of the costs of suit herein incurred;

4.    For prejudgment interest as permitted by law; and

5.    For such relief as the Court may deem appropriate.

Dated:  July 31, 2023                    HAYES SCOTT BONINO
                                         ELLINGSON & GUSLANI LLP

                                         By:  */s/ Stephen A. Scott*
                                         STEPHEN A. SCOTT
                                         CHARLES E. TILLAGE
                                         Attorneys for Plaintiff
                                         FABRINET


## <u>DEMAND FOR JURY TRIAL</u>

Fabrinet hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rule of Civil Procedure.

Dated:  July 31, 2023                    HAYES SCOTT BONINO
                                         ELLINGSON & GUSLANI LLP

                                         By:  */s/ Stephen A. Scott*
                                         STEPHEN A. SCOTT
                                         CHARLES E. TILLAGE
                                         Attorneys for Plaintiff
                                         FABRINET

**COMPLAINT FOR BREACH OF CONTRACT & ACCOUNT STATED**

# Exhibit A



141 Cecil Street
#08-05 Tung Ann Association Building
Singapore 069541

VOLUME SUPPLY AGREEMENT

This volume supply agreement (the "Agreement") is dated _____1 March____ 2019 (the "Effective Date"), and is between Pivotal Systems, a [technology company] with its principal office located at 48389 Freemont Blvd, Suite 100, Fremont, CA 94538 ("**CUSTOMER**") and Fabrinet, an exempt company organized under the laws of the Cayman Islands with its principal office located at 141 Cecil Street, #08-05 Tung Ann Association Building, Singapore 069541 ("**FABRINET**").

Fabrinet is a provider of contract product manufacturing and engineering services to original equipment manufacturers of optical components, modules and subsystems, industrial lasers and sensors.

Customer desires to engage Fabrinet to provide such services as applied to the manufacture of certain components, modules and subassemblies ("Product") using raw materials and equipment provided by Customer and/or Fabrinet as agreed by the parties.

The parties therefore agree as follows:

1.      **Obligations of Fabrinet**.

1.1      Fabrinet will arrange sufficient capacity, as agreed between the parties, to enable it to maintain manufacturing operations to support Customer's current and forecasted demand for Product.

1.2      Fabrinet will use Production Forecasts, Orders and Build Plans (each defined below) provided by Customer as a basis to plan and buy direct and indirect raw materials and production supplies as necessary to meet Customer's demand.

1.3      Fabrinet will assemble Product in compliance with Specifications (defined below) provided by Customer.

1.4      Fabrinet's obligation to perform under this Agreement is expressly conditioned upon Customer not being in material default of its obligations hereunder.

2.      **Obligations of Customer**.

2.1      Customer will provide all designs, drawings, technical information and specifications (collectively, the "Specifications") required for Fabrinet to procure materials, build, test, export Product, and conduct other activities associated with the production and delivery of Product.

2.2      Within ten (10) calendar days of the end of every month, Customer will provide Fabrinet with a written non-binding (except as set forth in Section 2.3 for Orders) forecast which projects the anticipated types and quantities of Products that Customer expects to purchase during the following twelve (12) months, itemized on a weekly basis for the first six (6) months and on a monthly basis thereafter ("Production Forecast"). Firm commitments on demand must be in writing.

2.3     Customer understands and agrees that the first thirteen (13) weeks of each Production Forecast will represent a binding commitment by Customer to purchase such quantities of Product from Fabrinet, for which Customer will issue a thirteen (13) week firm purchase order ("Order") with each Production Forecast. The terms and conditions of this Agreement will be incorporated into each Order. In the event of any conflicts, differences or inconsistencies between the terms and conditions of this Agreement and those of any Order, quotation, acknowledgement or any other related document (included pre-printed forms), the terms of this Agreement will govern.

2.4     Each week, Customer will provide Fabrinet with a build plan and delivery schedule of the types and quantities of Products required for the following four (4) weeks ("Build Plan"). The Build Plan may not be modified once received by Fabrinet.

2.5     Customer will use best efforts to ensure that its Production Forecasts, Orders and Build Plans are complete, accurate and updated in a timely manner.

2.6     Transfer Costs.  Customer is responsible for the costs and expenses associated with transfer of production from Customer's facility or a third-party's facility to Fabrinet, if any, as agreed upon by the parties.

3.      **Quality Control**.

3.1     Fabrinet will notify Customer in writing of any proposed changes to Product or related manufacturing and quality assurance processes before any such changes are implemented.  Such notice will include the reason for the change, details of its implementation and the planned date of the change. Customer may request test data and a sufficient sampling of Products affected by any proposed changes.  No changes will be made without Customer's prior written consent.

3.2     Fabrinet will perform incoming quality inspections on raw materials pursuant to the agreed upon inspection criteria.

3.3     Customer and its end-customer will have the right to inspect the facility where a Product is manufactured, upon reasonable notice to Fabrinet.

4.      **Product Demand and Inventory Liability**.

4.1     Fabrinet will use product demand information from Customer's Production Forecasts, Orders and Build Plans to plan and buy raw materials, including materials with long lead times ("Long-Lead Time Components"), materials that are non-cancelable/non-returnable to a supplier ("NCNR"), materials that require minimum order quantities ("MOQ"), materials that are unique to Customer's requirements ("Custom Components") and materials that are agreed upon in writing by the parties to require special treatment ("Special Components").  Customer and Fabrinet will agree upon a list of Long-Lead Time Components, NCNR, MOQ, Custom Components and Special Components, including procurement terms, to be attached to this Agreement as Exhibit A. Exhibit A required for each approved board and reviewed quarterly as part of QBRs

4.2     Customer understands and agrees that Fabrinet has no liability for raw material (including but not limited to on-hand and on-order Long-Lead Time Components, NCNR, MOQ, Custom

Pivotal Systems and Fabrinet VSA dated 1 March 2019

Components and Special Components), work in process, or finished goods (collectively "Inventory"), provided that Fabrinet complies with the terms of this Agreement. Customer is liable for all amounts due with respect to any Inventory that remains at the expiration or termination of this Agreement, or in the event of any Order cancellation or Product cancellation or end-of-life.

4.3   <u>Finished Goods</u>.  Customer will accept delivery of all finished Products within seven (7) days of completion and thereof case by case, provided the finished Products were assembled pursuant to an Order or Build Plan within the proper lead times, and Customer further agrees to remit payment for all such finished Product under the payment terms of this Agreement.

4.4   <u>Raw Materials</u>.  Customer is responsible for the cost of incoming freight on all raw materials and material handling fees (burden).  This is already built into the pricing agreed upon.

4.5   <u>Negotiated Material Prices and Terms</u>.  Any raw material prices negotiated by Customer directly with any vendor, whether for pre-production prototype builds or based upon projected annual volumes, will be contingent upon Fabrinet receiving the same pricing for such materials on the same or better payment terms from the vendor.  If vendor does not agree to extend the quoted materials prices and terms to Fabrinet, Fabrinet will attempt to locate an alternative source for such materials, to be approved by Customer and added to Customer's approved vendor list ("AVL").  Under no circumstances will Fabrinet be responsible for any raw material price variance or any Excess Inventory (as defined in Section 5.1 below) that results from Customer's direct negotiation of such prices with vendors.

4.6   <u>Supplier Charge-back</u>.  If Customer does not meet forecasted volumes established with a vendor to support annual volume raw material pricing that results in a charge-back to Fabrinet, Customer will reimburse Fabrinet for the charge-back incurred by Fabrinet.  Fabrinet will use reasonable efforts to mitigate the amount of such charge-back on behalf of Customer.

4.7   <u>Cancellation Charges</u>.  The parties understand that Fabrinet may incur charges assessed by vendors for the cancellation of raw material orders ("Cancellation Charges").  Customer will reimburse Fabrinet for any actual Cancellation Charges incurred. Fabrinet will attempt to notify vendors of a cancellation within one (1) business day of receipt of Customer's cancellation notice.  Fabrinet further agrees to audit a vendor's assessment and will make the results of such audit available to Customer.  Fabrinet agrees to promptly notify Customer of any Cancellation Charges and provide Customer with the option to pay the Cancellation Charges or purchase the raw materials on-order.

4.8   <u>Revaluation</u>.  Customer and Fabrinet may agree, from time to time, to revise the standard cost of raw materials required to manufacture Product to reflect current materials pricing. Prior to the implementation of any price or cost reductions, Customer will issue a revaluation purchase order to Fabrinet for the aggregate price difference between the old standard cost and the new standard cost for each unit of raw material validly procured by Fabrinet under the terms of this Agreement.  If Customer chooses not to issue a revaluation purchase order, then it must fully consume the existing inventory of raw materials at the old standard price prior to the implementation of any price or cost reductions.  Pricing is to be reviewed at QBRs with emphasis to lower cost and reduce risk of material exposure.

5.   **Excess Inventory and Obsolete Inventory**.

Pivotal Systems and Fabrinet VSA dated 1 March 2019

5.1     Excess Inventory.  Excess Inventory is defined as raw materials purchased by Fabrinet in compliance with the terms of this Agreement that have not been consumed within thirteen (13) weeks of Fabrinet's receipt of such raw materials (the "Excess Inventory Period").  Customer understands and agrees that any rescheduled deliveries as set forth in Section 7.1 , shall not change the Excess Inventory Period.  Fabrinet will provide an excess inventory report to Customer during the second week of every month.   On a quarterly basis, Fabrinet will invoice Customer for all raw materials deemed Excess Inventory at the standard cost including incoming freight charges and material handling fees (burden) unless otherwise agreed in writing.

5.2     Obsolete Inventory.  Obsolete Inventory is defined as (i) raw materials that, as a result of an ECO (defined at section 6, below), Product cancellation or end-of-life, have not been or will no longer be utilized in the manufacture of Product; and (ii) raw materials that have aged beyond the shelf-life period agreed by the parties.  Fabrinet will provide an obsolete inventory report to Customer every month.  Fabrinet will promptly invoice Customer for any raw materials deemed Obsolete Inventory at the standard cost including incoming freight charges and material handling fees (burden). Fabrinet will try to notify customer 6 months in advance and under particular circumstances of any EOL or OBS components used on their product as part of BOM reviews and agree on usage plan

5.3     Fabrinet will use reasonable efforts to mitigate Customer's liability for Excess Inventory and Obsolete Inventory.  However, notwithstanding the foregoing, Fabrinet will have no obligation under this Section 5.3 to mitigate Customer's liability for Excess or Obsolete Inventory with regard to any raw materials purchased from vendors that prohibit the resale of such inventory to others.

5.4     Customer's failure to timely pay for Excess Inventory or Obsolete Inventory pursuant to the terms of this Agreement, upon presentation of a valid undisputed invoice, is a material breach of this Agreement.

6.      **Engineering Change Orders**.

6.1     Customer may revise its Specifications at any time by submitting an engineering change order ("ECO") to Fabrinet.  Fabrinet will process and price ECO's on a per occurrence basis.  Premium or additional costs that may be incurred by Fabrinet as a result of an ECO will be negotiated and Customer will issue a purchase order to cover such costs prior to Fabrinet's implementation of an ECO.  Customer will be responsible for all residual or scrap raw materials and work in process, including Excess Inventory and Obsolete Inventory that may be generated by an ECO.  Customer is required to control changes through a controlled change management process known as Copy Exact (CE).  No changes can be introduced unless approved by Customer.

6.2     Fabrinet will submit its proposed ECO's to Customer for review and approval.  Customer will accept Fabrinet's standard ECO form.  Fabrinet will not implement any changes without the prior written approval of Customer.

7.      **Schedule Changes**.

7.1     Reschedule.  No delivery schedule changes are permitted for Products to be delivered within the next thirty (30) days.  For deliveries scheduled between thirty (30) days and ninety (90) days, Customer may extend the delivery date of an Order, in whole or in part, one time only, for a maximum

Pivotal Systems and Fabrinet VSA dated 1 March 2019

period of up to thirteen (13) weeks from the originally scheduled delivery date.  Finished Products may not be rescheduled.  Requests for exceptions will be evaluated in good faith.

7.2     Delivery schedule change authorizations will be communicated in writing and, after appropriate negotiation, will be confirmed by a formal change to the Order.  Customer is responsible for Excess Inventory that may result from any changes.  Customer is also responsible for additional costs incurred by Fabrinet due to schedule changes, including increases due to freight and modification or rework of Inventory.

7.3     <u>Cancellations</u>.  No Order cancellations are permitted for Products to be delivered within the following thirteen (13) weeks.

8.     **DELIVERY OF PRODUCT.**
8.1     Product Delivery – Ex-Works.  Unless agreed otherwise, Products will be delivered EXW (Incoterms 2010): Fabrinet Facility.  Title, ownership, and risk of loss or damage for such Products will pass from Fabrinet to Customer upon delivery of the Products to Customer's designated carrier at the Fabrinet Facility.  Customer will bear all transportation expenses and obligations for delivery of the Products.  As provided in Section 4.2 below, when the "Ship To" location in a Purchase Order or Statement of Work is designated as Fabrinet's plant or facility, it shall mean the Products, when completed and, shall be transferred to the Customer's Finished Goods / Consigned Materials ["FG/CM"] inventory at the Fabrinet's plant or facility, in a secure FG/CM warehouse, and such transfer shall constitute shipment and delivery of the Products within the meaning of this Agreement.  Title and risk of loss to Products shall pass to Customer upon (i) their delivery to the common carrier or to Customer's designee at Fabrinet's facility or, alternatively, (ii) such transfer to the Customer's FG/CM inventory at Supplier's plant or facility.
8.2     Manufacture, Bill and Hold Products.  Customer may request that Fabrinet manufacture, bill and hold a Product at Fabrinet's plant, pending instructions on when and where it is to be shipped.  Fabrinet will do so provided:

(a)     Customer makes and confirms this request in a P.O., Release or other document by designating the "Deliver To" or "Ship To" location as Fabrinet's plant location;
(b)     the Product, upon completion of its manufacture and packaging for shipment, will be transferred to Customers FG/CM warehouse (which shall be kept secure with monitored access), and will be kept in that warehouse pending receipt of shipping instructions from Customer;
(c)     the title and the risk of loss to the Product will transfer to Customer at the time it is transferred to FG/CM warehouse, and Fabrinet will bear no risk of loss to such Product except as may be incurred as a non-owner custodian of property owned by Customer as provided in this Agreement;
(d)     at the end of 3 months, if the Product is still in the FG/CM warehouse, Customer will arrange for it to be shipped to Customer, or to another location owned by or leased to Customer, or as it otherwise designates;
(e)     Fabrinet's obligations under this agreement in respect to the manufacture of the Product, and          its preparation for shipment, shall be deemed complete at the time the Product is completed, packaged for shipment, and transferred to the Customers FG/CM warehouse; and

Pivotal Systems and Fabrinet VSA dated 1 March 2019

(f)      Fabrinet will invoice Customer for the Product at the time it is transferred to the FG/CM warehouse, with such invoice to be paid by Customer in accordance with the payment terms in this Agreement.

9.    **Pricing and Payment Obligations.**

9.1    Pricing.  The pricing model in Exhibit B is complete and, except as otherwise provided in this Agreement, no additional charges of any type will be added without Customer's express written consent.  In the event the parties agree to a minimum monthly manufacturing fee, it will be indicated separately in Exhibit B.

9.2    Price Reviews.  Customer and Fabrinet agree to review changes in any costs and agree on appropriate price adjustments at least on a quarterly basis during the term of this Agreement.

9.3    Material Price Changes.  When market conditions cause a change in the individual price of raw materials, Fabrinet will promptly notify Customer of the anticipated change.  Fabrinet and Customer will attempt to find an alternative that will eliminate or reduce the price increase.  In the event that Fabrinet and/or the Customer cannot identify an acceptable alternative to maintain the existing price, the price of Product will be adjusted accordingly when the cost change takes effect.  Changes in individual prices of raw materials negotiated by Customer with a vendor will be passed through and adjusted in the Product price pursuant to section 4.5.

9.4    Upon Customer's request for the performance of services not described herein, Fabrinet will quantify the cost of such services and provide a quotation for Customer's prior written approval.  Upon receipt of invoice, Customer will be responsible for payment pursuant to the terms of this Agreement.

9.5    Fabrinet will ship Product at the direction of Customer in accordance with the current Build Plan provided that the amount due for such Product is within Customer's credit limit as determined by Fabrinet's credit department based on Fabrinet's good faith assessment of Customer's creditworthiness.  Fabrinet will submit invoices upon Product shipment and subject to Customer's then-current credit limit.

9.6    Payment Terms.  Payment is due and payable in U.S. dollars no later than thirty (30) days from invoice date.  Payment will be made via wire funds transfer according to instructions provided by Fabrinet.

9.7    If either party fails to invoice the other party ("Non-Invoiced Party") within one hundred eighty (180) days after the receipt of Products, raw materials or services, unless otherwise mutually agreed upon by the parties on a case-by-case basis, then the Non-Invoiced Party may close the corresponding Purchase Order related to such Products, raw materials or services and will not be required to make any additional payment for such items.

9.8    Right of Set Off.  Fabrinet will have the right to set off, at any time, any amounts Fabrinet may owe to Customer or any subsidiary or affiliate of Customer against any amounts Customer may owe to Fabrinet or any subsidiary or affiliate of Fabrinet whether arising under this Agreement or any other contract between Fabrinet and Customer or any subsidiary or affiliate of Customer.

Pivotal Systems and Fabrinet VSA dated 1 March 2019

10.    **Labor**.

10.1    Fabrinet will assign production supervisors, engineers, and dedicated program managers to manage the manufacture of Product.  Fabrinet will also provide overall project management including supply chain management, import/export services, quality control and production management.

10.2    Fabrinet will pay all personnel hired by Fabrinet to perform the services required by this Agreement.  Fabrinet will maintain all accounting records and administrative payroll taxes pertaining to such personnel.

10.3    Neither Fabrinet nor any of its employees will in any sense be considered an employee or an agent of Customer, nor will Fabrinet employees be entitled or eligible to participate in any benefits or privileges given or extended by Customer to its employees.  Similarly, Customer employees will not be entitled or eligible to participate in any benefits or privileges given or extended by Fabrinet to its employees.

10.4    During the term of this Agreement, Customer and Fabrinet jointly agree not to solicit or hire current employees of the other's company unless done by mutual agreement of the parties prior to any personal contact with the individual.  Nothing herein will prohibit either party from hiring individuals who respond to advertisements or general solicitations, whether these are placed in newspapers, trade journals, on websites or at trade or job shows and fairs.  If this clause is deemed by a court of law too broad to be enforceable, then it is the intent of the parties that this provision be interpreted to have the broadest scope allowable under current law.

11.    **Customer Equipment and Tooling**.  All equipment, tooling, work benches, parts (whether assembled or unassembled) and packaging furnished to Fabrinet by Customer pursuant to this Agreement (the "Customer Equipment") will be delivered to Fabrinet via DDP (Incoterms 2010): Fabrinet Facility.  The Customer Equipment will be delivered free of all liens and encumbrances and will deemed bailed to Fabrinet for Customer's benefit, and title thereto will at all times remain with Customer. Fabrinet will provide safe and secure storage for Customer Equipment, which will be used solely for the assembly of Product.

11.1    Equipment Delivery.  Fabrinet will provide assistance to facilitate the delivery of Customer Equipment to and from the Fabrinet Facility, using information provided by Customer. Customer will provide accurate description and valuation, certificate of origin, technical specifications, maintenance and calibration requirements and other literature for the Customer Equipment in a timely fashion.   Customer will be responsible for transportation costs in both directions (to and from the Fabrinet Facility).

11.2    Security Interest.  Notwithstanding the foregoing, Fabrinet will be entitled to retain possession of and use the Customer Equipment to manufacture and assemble the Product until such time as all raw materials purchased by Fabrinet pursuant to this Agreement are paid for in full by Customer or otherwise incorporated into finished Product.  Customer grants Fabrinet a security interest in Customer Equipment in its possession to secure all performance due Fabrinet under this Agreement.

Pivotal Systems and Fabrinet VSA dated 1 March 2019

11.3    Maintenance. Fabrinet will be responsible to arrange the performance of ongoing routine maintenance and calibration of the Customer Equipment. Customer will be responsible for the costs and expenses of such calibration and maintenance of Customer Equipment.

11.4    Surplus Properties. Customer Equipment and Customer consigned materials that the parties agree will no longer be used for production (the "Surplus Properties") will be kept in a safe place, however such items will not be maintained or calibrated. After six (6) months of non-use, Fabrinet may charge Customer a storage fee based on the actual space required to store Surplus Properties based on then-current warehouse space cost. After twelve (12) months of non-use and storage, Fabrinet will no longer maintain insurance coverage for Surplus Properties and risk of loss or damage for such assets shall transfer to Customer and Customer must promptly remove the Surplus Properties from Fabrinet's premises.

11.5    Insurance. Fabrinet at its own expense, will purchase general insurance coverage in the amount of the agreed value as declared for Customer consigned Equipment, Machinery, Stocks and/or inventory (collectively the "Consigned Assets"). For Customer Consigned Assets held in the care and custody of Fabrinet, the basis of valuation shall be the agreed value as set forth in a declaration of such assets prior to loss or damage. Customer will provide to Fabrinet's Insurance Department, not more frequently than on a quarterly calendar basis, an accurate list of its Consigned Assets along with its estimate of the replacement as new value of such assets. Customer will use its best efforts to ensure that its list of Consigned Assets and valuation is complete and accurate. Upon receipt of Customer's information, Fabrinet will review and respond in writing with any questions or concerns. Fabrinet and Customer then will decide on the agreed value as declared of Consigned Assets and Fabrinet will ensure it has insurance coverage in such amount not later than the following calendar quarter. Fabrinet will not be responsible for and Customer shall not make a claim against Fabrinet for any loss or damage in excess of the agreed value as declared of the Consigned Assets or for any inadequate insurance coverage resulting from Customer's failure to provide complete and accurate information with regard to the identification and valuation of Consigned Assets. Provided Fabrinet has insurance in the agreed coverage amount, Customer unconditionally agrees its sole and exclusive remedy against Fabrinet for any claim arising out of any loss or damage to Consigned Assets will be limited to any net amounts actually recovered by Fabrinet and Customer under the insurance coverage obtained by Fabrinet to cover such Consigned Assets and in no case will the total liability of the Fabrinet's insurers exceed the agreed value in respect of each insured item. If Customer has its own insurance to cover any Consigned Assets, Customer shall promptly notify and provide a copy of its insurance policy to Fabrinet and confirm that the Customer's insurers agree to waive any subrogation rights against Fabrinet.

12.    Taxes and Duties. Customer will pay all customs tariffs, bonds, and broker charges and all other charges, fees, levies, or assessments required pursuant to Thai law with respect to the import to or export from Thailand of any equipment or raw materials necessary for the manufacture of Product or as otherwise required by the terms of this Agreement.

13.    Confidentiality. Each party will not disclose any trade secrets, intellectual property, confidential or proprietary information ("'Proprietary Information") of the other party to any third party and will protect the Proprietary Information it receives with the same degree of care it provides to its own Proprietary Information, but not less than a reasonable degree of care, so as to prevent its unauthorized use, dissemination or publication. All Proprietary Information will be clearly marked as such by the party which wishes the Proprietary Information remain secret. This clause will not apply to information

in the public domain generally available through other sources, legitimately obtained from third parties, or already in the possession of the receiving party.

14.    **Patent Warranty**. Customer will indemnify Fabrinet against any loss or expense arising out of any claim brought against Fabrinet for a claim of infringement of any third party intellectual property rights alleged or determined to be caused by Customer-supplied Specifications, design, process, written instructions or raw materials relating to the Products; provided, that Fabrinet (i) notifies Customer promptly of any such claim, (ii) allows Customer, at Customer's option, to participate in or fully control the defense with Customer's chosen counsel, and (iii) fully cooperates with such defense.

15.    **Warranty**.

15.1    Product Warranty. Fabrinet warrants that Products will be manufactured in strict compliance with the Specifications and be free from defects in workmanship under normal use and operation. The above warranty will remain in effect for a period of one (1) year from the date any Product is initially delivered to Customer ("Warranty Period").

15.2    Repair or Replacement of Defective Product. Fabrinet will either repair or replace, in its sole discretion, any Product that contains a defect caused by a breach of the warranty set forth in section 15.1. If Customer desires to return a Product based on a claim of breach of the warranty set forth in section 15.1 ("RMA Product"), Customer will request an RMA number from Fabrinet. Customer will return the alleged defective Product to the Fabrinet Facility, specify the RMA number and include documentation describing the nature of the defect, how it was discovered and under what conditions it occurred. Fabrinet will analyze any such RMA Product and, if a breach of warranty is found ("Defect"), then Fabrinet will repair or replace the RMA Product within thirty (30) days of receipt by Fabrinet of the RMA Product and all required associated documentation. In the event a Defect is found, Fabrinet will reimburse Customer for the reasonable cost of transporting the RMA Product to the Fabrinet Facility and Fabrinet will ship the repaired RMA Product or its replacement to Customer. All repaired Products will be warranted for a period of one hundred twenty (120) days from the date of shipment or the remainder of the original Warranty Period, whichever is greater. If no Defect is found, Customer will reimburse Fabrinet for all fees, costs and expenses incurred to analyze and, if requested by Customer, repair or replace the non-Defective RMA Product and Customer will bear responsibility for all transportation costs to and from the Fabrinet Facility.

15.3    LIMITATION OF WARRANTY. THE WARRANTY SET FORTH IN SECTION 15.1 IS IN LIEU OF, AND FABRINET EXPRESSLY DISCLAIMS, AND CUSTOMER EXPRESSLY WAIVES, ALL OTHER WARRANTIES AND REPRESENTATIONS OF ANY KIND WHATSOEVER WHETHER EXPRESS, IMPLIED, STATUTORY, ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR OTHERWISE.

15.4    Third-Party Materials. Fabrinet will use reasonable efforts to obtain, and will pass through to Customer, any warranty rights that Fabrinet receives from a third-party vendor of raw materials (the "Third-Party Materials"). Fabrinet will use reasonable efforts to assist Customer in enforcing such warranty rights.

16.    **Term**. The term of this Agreement will be for an initial period of three (3) years commencing on the Effective Date ("Initial Term"). This Agreement will renew automatically for successive one (1) year periods ("Renewal Term") unless either party provides written notice of its intent to terminate the

Pivotal Systems and Fabrinet VSA dated 1 March 2019

Agreement no later than one hundred eighty (180) days prior to the expiration of the Initial Term or any Renewal Term.

17.   **Termination**.

17.1   This Agreement may be terminated (i) by mutual agreement of the parties; or (ii) upon one hundred ( 100) days prior written notice if either party reasonably determines that the business relationship should be terminated.

17.2   In the event of a material breach of this Agreement other than the obligation to pay, the non-breaching party must provide written notice to the breaching party, who will have thirty (30) days to cure. Either party may terminate this Agreement if a material breach of this Agreement remains uncured thirty (30) days following delivery of written notice.

17.3   Upon termination or expiration of this Agreement, Fabrinet will complete an orderly shutdown of the assembly operation and return of raw materials, Customer Equipment and other property of Customer at negotiated cost levels. All money due and payable, including Cancellation Charges, if any, will be paid within thirty (30) days of submission of a valid invoice by Fabrinet to the Customer and before any Customer Equipment, Inventory, Product, or any other item is shipped to Customer. Fabrinet will ship all of Customer's property including Excess Inventory and Obsolete Inventory to a Customer designated location at the expense of Customer. Fabrinet will make Inventory, documentation and other evidence bearing on payment available to Customer for its inspection.

17.4   **Suspension of Performance**.   Any obligation of Fabrinet to perform under this Agreement (including, but not limited to, the delivery or manufacture of Products or the purchase of Long-Lead Time Components, NCNR, MOQ, Custom Components, Special Components or other raw materials) will automatically be suspended *in toto* without any notice or further action by Fabrinet at such time as any amount due Fabrinet under this Agreement remains unpaid in whole or in part more than sixty 60 days after such amount first becomes due, and Fabrinet will have no obligation to further perform under this Agreement until all such delinquent amounts are paid in full. Notwithstanding the automatic suspension of Fabrinet's performance obligations, Fabrinet may, as a matter of its sole and unfettered discretion, elect to perform on terms and conditions it deems appropriate, and Fabrinet will be entitled to payment for such performance pursuant to the terms of this Agreement.

17.5   **Build-Out License**.   Customer grants Fabrinet a royalty-free, world-wide, non-exclusive, non-transferable license to Customer's Intellectual Property (including, but not limited to, patents, copyrights, trademarks and trade secrets) to the extent incorporated, embodied, or utilized in the manufacture of the Product for the limited purpose of enabling Fabrinet (i) to complete the manufacture of Product to the extent of work in process and raw materials on-hand or on-order at the time of termination of this Agreement (the "Build-out Product") and (ii) to market, distribute and sell all Inventory held by Fabrinet at the time of termination of this Agreement together with the Build-out Product. This license shall survive any termination of this Agreement other than a termination by Customer for Fabrinet's actual material breach, but shall terminate upon payment in full of all amounts due Fabrinet under this Agreement.

18.   **Publicity**.   Neither party will refer to this Agreement in any publicity or advertising or disclose to any third-party any of the terms of this Agreement without the consent of the other party. A party may

Pivotal Systems and Fabrinet VSA dated 1 March 2019

disclose the existence of this Agreement and its terms to its attorneys and accountants, vendors, end-customers and others, subject to reasonable confidentiality restrictions, and only to the extent necessary to perform its obligations and enforce its rights hereunder.

19. **Force Majeure.** Neither party will be liable for any delay in performing, or for failing to perform, its obligations under this Agreement (other than the payment of money) resulting from any cause beyond its reasonable control including, acts of God; blackouts; power failures; inclement weather; fire; explosions; floods; hurricanes; typhoons; tornadoes; earthquakes; epidemics; strikes; work stoppages; slow-downs; industrial disputes; sabotage; accidents; destruction of production facilities; riots or civil disturbances; acts of government or governmental agencies, including changes in law or regulations that materially and adversely impact the party; provided that the party affected by such event promptly notifies (in no event more than five (5) business days from discovery of the event) the other party of the event. If the delays caused by the force majeure conditions are not cured within thirty (30) days of the force majeure event, then either party may immediately terminate this Agreement. Termination of this Agreement pursuant to this section 19 will not affect Customer's obligation to pay Fabrinet for services provided, as set forth herein.

20. **Relationship of Parties**. Fabrinet will perform its obligations hereunder as an independent contractor. Nothing contained herein will be construed to imply a partnership, joint venture or agency relationship between the parties. The parties will not be entitled to create any financial or other obligations to third-parties on behalf of the other party, except as expressly contemplated by this Agreement.

21. **Assignment**. Neither party may assign, delegate or transfer (whether by reverse or forward merger, reincorporation, reorganization, sale of all or substantially all of the assets or any other change in control of a party), in whole or in part, this Agreement or any of its rights or obligations arising hereunder without the prior written consent of the other party, which consent will not be unreasonably withheld, conditioned or delayed (except that Fabrinet may assign its obligations to a subsidiary or affiliate). Any purported assignment without such consent will be null and void.

22. **Notice**. All notices, demands and other communications made hereunder will be in writing and will be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid), or by facsimile (fax) addressed to the respective parties at the following addresses:

| As to Customer: | As to Fabrinet: |
|---|---|
| Pivotal Systems Inc. <br> 48389 Fremont Blvd., Suite 100 <br> Fremont, CA 94538 <br> ATTN: Kevin Hoskins <br> V.P. of Operations & Supply Chain <br> Telephone: 510-770-9215 x205 <br> Email: khoskins@pivotalsys.com | Fabrinet <br> C/O Fabrinet Pte. Ltd. <br> 141 Cecil Street <br> #08-05 Tung Ann Association Building <br> Singapore 069541 <br> ATTN: Toh-Seng Ng, Chief Financial Officer <br> Email: tsng@fabrinet.co.th <br><br> With a copy to: <br><br> ATTN: Legal Department |

Pivotal Systems and Fabrinet VSA dated 1 March 2019

| | FABRINET |
| | 3736 Fallon Road, #428 |
| | Dublin, CA 94568 |
| | Email: contracts@fabrinet.com |

23. **Entire Agreement**. This Agreement, the Exhibits and any addenda attached hereto or referenced herein, constitute the complete and exclusive statement of the agreement of the parties with respect to the subject matter of this Agreement, and replace and supersede all prior agreements and negotiations between the parties. Each party acknowledges and agrees that no agreements, representations, warranties or collateral promises or inducements have been made by any party to this Agreement except as expressly set forth herein or in the Exhibits and any addenda attached hereto or referenced herein, and that it has not relied upon any other agreement or document, or any verbal statement or act in executing this Agreement. These acknowledgments and agreements are contractual and not mere recitals. In the event of any inconsistency between the provisions of this Agreement and any Exhibit and any addenda attached hereto or referenced herein, the provisions of this Agreement will prevail unless expressly stipulated otherwise, in writing executed by the parties. Pre-printed language on each party's forms, including purchase orders, will not constitute part of this Agreement and will be deemed unenforceable.

24. **Amendment**. No course of dealing between the parties hereto will be effective to amend, modify or change any provision of this Agreement. This Agreement may not be amended, modified or changed in any respect except by an agreement in writing signed by the party against whom such change is to be enforced. The parties may, subject to the provisions of this section 24, from time to time, enter into supplemental written agreements for the purpose of adding any provisions to this Agreement or changing in any manner the rights and obligations of the parties under this Agreement or any Exhibit hereto. Any such supplemental written agreement executed by the parties will be binding upon the parties.

25. **Partial Invalidity**. Whenever possible, each provision of this Agreement will be interpreted in such a way as to be effective and valid under applicable law. If a provision is prohibited by or invalid under applicable law, it will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

26. **Waiver**. Waiver by either party of any breach of any provision of this Agreement will not be considered as or constitute a continuing waiver or a waiver of any other breach of the same or any other provision of this Agreement.

27. **LIMITATION OF DAMAGES**. EXCEPT WITH REGARD TO ANY INDEMNITIES OR A BREACH OF THE CONFIDENTIALITY PROVISIONS SET FORTH HEREIN, UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PERSON OR ENTITY UNDER ANY CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE, OR OTHER LEGAL OR EQUITABLE CLAIM OR THEORY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY OR PUNITIVE DAMAGES, PENALTIES, LOSS OF GOODWILL OR BUSINESS PROFITS, LOST REVENUE, BUSINESS INTERRUPTION, WORK STOPPAGE, DATA LOSS, COMPUTER FAILURE OR MALFUNCTION, OR WHETHER SUCH PARTY WAS INFORMED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE LIABILITY OF FABRINET HEREUNDER SHALL BE LIMITED TO THE AMOUNTS PAID BY CUSTOMER UNDER THIS AGREEMENT. THE FOREGOING WILL NOT EXCLUDE OR LIMIT EITHER PARTY'S LIABILITY FOR DEATH OR PERSONAL INJURY RESULTING

Pivotal Systems and Fabrinet VSA dated 1 March 2019

FROM ITS NEGLIGENCE TO THE EXTENT THAT SUCH LIABILITY CANNOT BY LAW BE LIMITED OR EXCLUDED.

28. **Attorneys' Fees and Costs**. In the event that attorneys' fees or other costs are incurred to enforce payment or performance of any obligation, agreement or covenant between the parties or to establish damages for the breach of any obligation, agreement or covenant under this Agreement, or to obtain any other appropriate relief under this Agreement, whether by way of prosecution or defense, the prevailing party will be entitled to recover from the other party its reasonable attorneys' fees and costs, including any appellate fees and the costs, fees and expenses incurred to enforce or collect such judgment or award and any other relief granted, and the costs, fees and expenses incurred to enforce or preserve the rights of one party in a bankruptcy or other insolvency proceeding wherein the other party is named as the debtor.

29. **Governing Law and Jurisdiction**. All matters arising out of this Agreement will be governed by the laws of the State of California, without application of conflicts of law principles. Venue will be the Federal Court of the Northern District of California, Santa Clara County, California. The provisions of the United Nations Convention on Contracts for the International Sale of Goods do not apply to this Agreement.

*<SIGNATURE PAGE FOLLOWS>*

Pivotal Systems and Fabrinet VSA dated 1 March 2019

13

**CUSTOMER**

By: _____

Kevin Hoskins
Vice President, Operations & Supply Chain
Pivotal Systems, Inc.

**FABRINET**

By: _____

Seamus Grady
Chief Executive Officer

Pivotal Systems and Fabrinet VSA dated 1 March 2019